## WALLINGFORD BROS. v. BUSH.

(Circuit Court of Appeals, Eighth Circuit. November 7, 1918.)

### No. 5075.

CARRIERS ☞194—FREIGHT CHARGES—PERSONS LIABLE.

    One who became the owner of a grain shipment while it was in transit, etc., but whose ownership ended before delivery of the shipment to a purchaser, *held* under no obligation to pay freight charges after delivery.

    Hook, Circuit Judge, dissenting.

In Error to the District Court of the United States for the District of Kansas; John C. Pollock, Judge.

Action by B. F. Bush, receiver of the Missouri Pacific Railway Company, against Wallingford Bros. There was a judgment for plaintiff, and defendants bring error. Reversed, with directions.

Ray Campbell, of Wichita, Kan. (J. Graham Campbell, of Wichita, Kan., on the brief), for plaintiffs in error.

W. P. Waggener and J. M. Challiss, both of Atchison, Kan., for defendant in error.

Before HOOK and STONE, Circuit Judges, and MUNGER, District Judge.

STONE, Circuit Judge. This is a writ of error from a judgment entered after an order sustaining a demurrer to the answer filed by plaintiffs in error. The suit is by a carrier for the amount of an inadvertent undercharge on an interstate shipment. Plaintiffs in error had contracted for a large amount of corn from the Farmers' Elevator Company, located at Green Mountain, Iowa. No particular corn had been purchased, but only corn of a certain description. This particular car, with intent that it should constitute part of the purchase, the elevator company shipped to Cedarvale, Kan., under a shipper's order bill of lading, with the notation: "Notify Wallingford Brothers." Before this shipment the plaintiffs in error had sold a quantity of corn to L. C. Adams Mercantile Company, of Cedarvale. The elevator company drew for the sale price of the corn upon the plaintiffs in error, attaching to that draft the bill of lading. Wallingford Bros. met this draft, received the bill of lading, and very shortly afterward attached it to a similar draft against the mercantile company. This draft in turn was paid, the mercantile company received the bill of lading, and upon the arrival of the car of corn at Cedarvale, Kan., surrendered the bill and received the shipment.

The plaintiffs in error present two points here: First, that there was no proof before the court as to the amount of the undercharge; second, that they were not the proper parties to be sued for any undercharge, as they were not parties to the contract of shipment. In the course of argument counsel for plaintiffs in error stated that they would not insist upon the first point, as they desired the ruling of the court upon the second proposition. As this seems the desire of both parties, the case will be considered only in relation to the latter point.

It is true, as claimed by plaintiffs in error, that they were not nominal parties to the contract of shipment. However, defendant in error insists that they were the real owners of the corn at the time the corn was shipped and the shipment contract made, and also were such when the shipment was delivered; that the elevator company was their agent in making the contract of shipment, and the mercantile company in the receipt of the corn; that they are liable as undisclosed shippers, or as consignee taking delivery, or as owner of the shipment. In our judgment they were not undisclosed shippers (consignors), nor undisclosed consignees taking delivery, nor owners at the time either of the shipment or of the delivery. Their sole connection with the shipment was that they owned it for the brief period between the payment by them of the draft with bill of lading attached and the payment to them of a similar draft by the mercantile company. This ownership began and ended while the shipment was in transit. Only during that period had they any manner of control over the shipment. At any other time their wishes regarding the shipment could have been ignored by the railway, and they could have been treated by it as strangers to the shipment. Does such a brief ownership while the shipment is in transit give rise to any obligation to pay the charges after delivery?

Such an obligation must be contractual. No express contract here involved carries such duty. There seems no reason for the law to raise such by implication. It is common knowledge that some commodities, particularly grain, are sold several times while in transit. It would be startling and upsetting to dealers in such commodities to ascertain that a fleeting, temporary ownership of the grain in transit had cast upon each such owner a liability, which endured long after such ownership, to the railway to pay the freight charges. There is no counterbalancing consideration in favor of the railway. It need not take the shipment until it has received the freight charge. It need not deliver it until its charge is paid. If it chooses to rely upon credit, it is given that of the parties to the shipping contract, of the consignee to whom delivery is made, or of his assignee to whom delivery is made, and of the undisclosed principals (including owner) of any of the above. 10 C. J. 445 et seq., with notes. Thus the carrier is given every reasonable means of securing the payment of its charges. It certainly is not necessary to extend the field for the protection of the carrier. To do so would interfere with the present orderly business methods worked out by practical men and generally employed in a very large and important trade. In our judgment there is no basis for any implied contract based upon such transitory ownership.

The carrier has not claimed that on the present record it can avail itself of any matter in the answer to which the demurrer was sustained. Much less can it found thereon a cause of action entirely different from that stated in its petition. This would eliminate the suggestion that the carrier may rely upon the contracts between the elevator company and plaintiffs in error, and between such plaintiffs and the mercantile company, on the theory of contracts made for its benefit.

The demurrer to the answer should have been overruled. The judgment is reversed, with directions to proceed in accordance herewith.

HOOK, Circuit Judge (dissenting). Some admitted facts, which seem to me to be material to the question decided, do not appear in the foregoing opinion. In substance and effect they are as follows: Wallingford Bros., the defendants, bought the car of corn, in respect of which the freight undercharge occurred, from their vendor at Green Mountain, Iowa, and directed its shipment to Cedarvale, Kan. They sold it to be delivered at Cedarvale at a specified price, which included all freight charges to that place, whatever they might be. The corn was transported from Green Mountain to Cedarvale. In dealing with their vendor at the point of origin, defendants were to pay the freight charges, and they specifically reserved the right to route the shipment and also to change its destination. In selling to their vendee at Cedarvale, they likewise reserved the right of routing, and they designated the railroad of the plaintiff as the final carrier. The transportation was at the instance of defendants; they caused it. As between the three parties successively owning the corn, they alone were to pay the freight charges. The others were not financially interested in the amount of the charges. The price their vendor was to receive was f. o. b. Green Mountain. The price their vendee was to pay them was basis Cedarvale, which, as the shipment actually terminated there, was in effect f. o. b. Cedarvale. Had the vendee diverted the shipment, the rate to Cedarvale would have been the measure of defendants' liability to them for the freight; but it was not diverted. Defendants left in the hands of their vendee a part of the contract purchase price with which to pay the freight to Cedarvale, and when they did so the vendee became their agent in that particular. The vendee was to pay so much for the grain at Cedarvale, no more, no less, and was not financially interested in the amount of the freight, or in its payment, except as necessary to get possession from the railroad. The course of the bill of lading and the drafts was consistent with the above.

It is argued by counsel that under the decisions of the courts the railroad could not maintain an action for the undercharge against defendants' vendee who got the corn at Cedarvale. Since the railroad must under the law require somebody to pay, it would follow, if the argument is sound, that the action would have to be against defendants' vendor at Green Mountain. But the vendor sold to defendants f. o. b. Green Mountain, and simply followed their shipping directions. If it were compelled by judgment to pay, it could in turn compel reimbursement from defendants; and thus the opinion of my Brothers would operate in a roundabout way to secure justice, when, as it seems to me, there is a plain, direct road. A bill of lading is not conclusive of the relations of the parties named as consignor and consignee to the property transported. Inquiry into the transaction in which it originated is admissible. That is familiar law, and it accords with common knowledge that very frequently one or both of them act for undis-

closed principals. It is easily conceivable that the "notify party," so called, may be both consignor and consignee in substance and fact. The right of a railroad to a freight charge, the amount of the charge, and its legal duty to require payment in full, do not arise from the bill of lading. The right arises from the fact of carriage or transportation; the amount is determined by application of the published schedules; and the duty to collect in full is prescribed by statute carrying penalties.

It may be that the petition in the case will not, without amendment, support a judgment for plaintiff upon the admissions in the answer; but a decision of what will eventually be the controlling question was sought in the trial court and here by both parties.